## FORT DODGE, D. M. & S. RY. CO. v. CHICAGO GREAT WESTERN RY. CO.

### No. 14537.

United States Court of Appeals Eighth Circuit.

July 8, 1952.

Rehearing Denied Aug. 7, 1952.

Denis M. Kelleher, Ft. Dodge, Ia. (Walter R. Dyer, Boone, Ia., on the brief), for appellant.

Hubert C. Jones, Des Moines (Donald Evans, Des Moines, and Bert B. Burnquist, Ft. Dodge, Ia., on the brief), for appellee.

Before SANBORN, WOODROUGH, and RIDDICK, Circuit Judges.

WOODROUGH, Circuit Judge.

Appeal from a judgment on jury verdict in favor of the plaintiff Chicago Great Western Railway Company against defendant Fort Dodge, Des Moines and Southern Railway Company for damages resulting from collision of two of their trains. There was federal jurisdiction by reason of diversity of citizenship and amount involved.

At the town of Rinard, Iowa, the main east and west line of the Chicago Great Western is crossed at grade by the electric line of the Fort Dodge, Des Moines and Southern, and at 9:15 o'clock on the "clear, dry, sunny" morning of October 3, 1950, a collision occurred at the intersection between a freight train of the Great Western going east, and a Fort Dodge freight train going south [1] which caused damage to the

---

[1] The directions are in railroad parlance and not geographically accurate.

Great Western in the stipulated amount of $132,159.42.

The Great Western brought this action for its damages against the Fort Dodge road alleging in general terms in its complaint that the negligence of the defendant was the sole proximate cause of the collision and that plaintiff was free from any negligence which contributed thereto. The defendant in answering admitted the occurrence of the collision and substantial damage resulting to the plaintiff but denied the allegations of the complaint that were not admitted. It alleged generally that plaintiff was guilty of negligence which contributed to cause said collision and which was a proximate cause thereof.

It also pleaded as an affirmative defense that certain provisions of contracts which were in force between the two railroads and defined the liabilities for loss or damage from specified causes, precluded plaintiff from recovering for the loss and damages sued for in that said contracts provided that each of the two railroads should bear all loss or damage to it arising from the fault or negligence of the person employed or engaged in the operation of the interlocking plant adjacent to the intersection which was used to control the movements of trains at and across the intersection.[2] Defendant alleged that the loss and damage claimed by plaintiff in the action "arose from the fault and negligence of * * * the person employed and engaged in the operation of the interlocking plant" and that his fault and negligence was a proximate cause of the collision "in that he signalled and directed the defendant's train to proceed across the intersection where it was struck by plaintiff's train". That plaintiff was therefore barred by the pro-

visions of the contracts from recovering in the action.

In its reply the plaintiff admitted that the contract between the parties defined the mutual rights, duties and responsibilities of the parties with relation to the operation of the railroad station at Rinard and also as to the operation of the interlocking plant at the time of the accident, and that pursuant to the contract the two railroads had a joint station agent in their employ at said station.

Plaintiff denied that the accident was caused by the fault or negligence of the joint agent on duty at the time of the accident and further denied that said person signalled and directed defendants to proceed over the intersection. It alleged that the loss and damage sustained by plaintiff was the result of the negligence of the exclusive employees of defendant.

It appeared on the trial of the case to the court and jury that the predecessor in interest of the defendant railroad had acquired the right to cross the earlier established railroad of plaintiff's predecessor at Rinard with an electric line through court proceedings which resulted in a decree in 1903 conferring the crossing right, but on the condition of the electric road's constructing, maintaining and operating an interlocking plant to safely control the movement of trains at and across the intersection. The interlocking plant is operated with levers and functions in such a way as to set the semaphore Stop and Go signals for train movements so that the giving of conflicting signals is mechanically blocked and prevented. After and in pursuance of the decree, a contract was entered into between the railroads in 1903 which was modified and supplemented by

2. The paragraph of the contract relied on reads as follows:

"13. It is further mutually agreed between the parties hereto that each party shall bear and pay all loss and damage to its own property, or to the property in its charge, and all loss and damage or injury to or death of any person or persons in its employ, or in its care as a carrier, or otherwise, which shall arise from the fault or negligence of any person or persons employed or engaged in

the operation or maintenance of such interlocking plant, and that each party shall bear and pay all loss and damage which shall result from the fault or negligence of its own exclusive employees. Each party hereto agrees to indemnify the other party against, and save it harmless from all such claims, loss, damage and recovery, which by the terms hereof it has itself assumed and agreed to pay, and from all costs, expenses, and attorneys' fees incident thereto."

another in 1931 by which contracts the obligation on the predecessors of the defendant and in turn upon the defendant to operate the interlocking plant as a condition of the right to cross the plaintiff's railroad had been continued up to the time of the accident.

Pursuant to the contracts the signals were kept blocked against defendant's electric line and open for the Great Western's line at all times except when a train of defendant was required to cross the intersection.

The contracts made following the court decree have also provided for a single railroad station to be used by both railroads in carrying on their respective businesses at Rinard and also for the employment of a joint station agent to do the customary station agent work for both roads. The interlocking plant was not installed in a separated tower, as is sometimes done, but pursuant to the contracts the operating levers and timing device were located in the railroad station building upon a platform elevated some forty inches above the floor level. Changes were made in the number of men employed over the years, according to the volume of business, but at the time of the accident only one man was employed as joint station agent and the same man was also employed by defendant to operate the interlocking plant. His name was Roy R. Shriver. Defendant also employed him to perform additional duties for it at a small building adjoining the station on the north side, called the sub station, where the electric current used by defendant was converted for its motors, by means of the machinery located there, from alternating to direct current.

The evidence was that the defendant employed and instructed R. R. Shriver in the duties of operating the interlocking plant and paid him the compensation he received for that service, and at all times had the right to discharge him. The situation in which opening up the passageway across the East and West line for the North and South electric trains and doing the necessary signalling for them to cross has been the exclusive job of the predecessors of the defendant and then of the defendant appears to have continued unchanged for nearly half a century. It was defendant's job at the time of the accident.[3]

3. The provisions of the contracts particularly relied on were Sections 1, 3 and 4. Plaintiff and defendant here are successors in interest to other parties, so the interpolations in brackets are made for clarity.

"Section 1. Upon taking effect of this agreement as herein provided, [defendant] shall, during the continuance hereof, employ only one man at Rinard depot to act as the joint agent of the parties hereto in conducting the business and operations of each party hereto at said depot. The regular hours of duty of the joint agent at the depot shall be from four o'clock A.M. (4:00 A.M.) to seven fifteen o'clock A.M. (7:15 A.M.) and from eight fifteen o'clock A.M. (8:15 A.M.) to one o'clock P.M. (1:00 P.M.) each day when reasonably and necessarily required, and during such hours of duty he shall also operate the interlocking plant, in addition to his duties of conducting the business of the depot as joint agent. The regular hours of duty as aforesaid shall be changed from time to time as the interests and requirements of the parties may appear.

"Section 3. The [plaintiff] company shall pay to the [defendant] monthly, and within twenty (20) days after bills therefor shall be received, one half of the monthly wages paid to said joint agent. It is understood and agreed, however, that the hourly rate to be paid the joint agent for joint agency work shall be fifty seven cents (57¢) per hour as of the date hereof, and that this rate shall be subject to change from time to time as circumstances may require. The hourly rate so paid by the [defendant], and in which the [plaintiff] company shall participate as above, shall be for duties performed by the joint agent in conducting the station business as ordinarily and customarily conducted at similar railroad depots on the lines of the [plaintiff] company. Any amounts paid over and above the joint agency rate, (as established from time to time) for operating the interlocking plant, or for performing duties not ordinarily and customarily a part of a depot agent's duties, shall be assumed exclusively by the [defendant]. All overtime which shall accrue to the joint agent shall be assumed by the party hereto that was being exclusively served during the time that such overtime accrued; provided, all overtime worked by the joint agent.

Certain operating rules of the railroads, claimed to be pertinent, were also introduced in evidence. They included provisions governing the control of the train movements by means of the interlocking plant and were obligatory upon the leverman and the engineers and motormen who operated the trains across the intersection. The rules prohibited the use of hand signals as authority to pass signals fixed at Stop by the interlocking plant and provided that such a movement could be made only under authority of a caution card to be signed by the leverman and handed to the engineman. When the interlocking plant was out of order and proper semaphore signals could not be given, the "towerman" or "signalman" (the designations are used interchangeably in the Rules) was required to go on the ground and stand in the center of the track and give train signals with a green flag in the day time and a green light at night.

The evidence showed beyond dispute that the motorman on defendant's train who was admittedly defendant's exclusive agent, was guilty of negligence in the operation of his train in violation of the rules and that his negligence was a direct and proximate cause of the collision. His own testimony (substantially corroborated) was to the effect that when he approached the intersection with his train of seven cars, including the electric motor and the caboose, and stopped at the semaphore of the interlocking plant which stood about 500 feet north of the intersection, the semaphore signal was set at Stop against him and he saw it. Although he had many years experience in his employment and knew the railroad rules and knew that he had no right under the rules to proceed through on the track closed to him by the signal Stop, and that under the rules he had no right to move on a hand signal, and although he knew that he had not received authorization to proceed required by the

rules and that his proceeding was wrong under the rules and that he was violating the rules in proceeding forward, he did, nonetheless, proceed on to the intersection and into the collision with the Great Western train. It appeared that when he became aware of the approach of that train he tried to speed his train across the intersection in front of it and failed. Its engine struck the third car back from defendant's electric motor in defendant's train and was overturned. The motorman sought to excuse himself because he said he thought that R. R. Shriver had given him a high ball hand signal to proceed and he never saw the Great Western train until too late.

The undisputed proof was that that train had proceeded pursuant to the Go signal fixed for it on the semaphore of the interlocking plant which was seen and obeyed by its crew and there was no showing or claim that its crew was guilty of any negligence contributing to the accident.

The evidence also showed that when the motorman on defendant's southbound train stopped at the Stop signal some 500 feet north of the Rinard station he blew four blasts of the whistle to apprise R. R. Shriver that the train was stopped at the block signal waiting for the signal to proceed. Shriver stepped into view on the platform of the station and saw defendant's train standing at the Stop signal whistling and he pointed towards the Great Western train to let defendant's motorman know that the reason the Stop signal was lined up against him was because of the oncoming Great Western train. The reason Shriver gave for showing himself on the platform and pointing as he did was that when defendant's trains were stopped and standing at the Stop signal they would whistle and whistle and think he was inside at the machines and was unaware of their presence. He said that when he went outside and was standing on the platform

in operating the interlocking plant shall be assumed by the [defendant] regardless of the party that was served.

"Section 4. The interlocking plant shall at all hours of the day and night, (when the same shall not be in use by rea-

son of the movements of the trains, engines and cars of the [defendant]) be lined and securely locked for movements of the trains, engines and cars of the [plaintiff] company * * *."

the motorman who had the block against him "Knew he couldn't get the clear signal with me standing outdoors instead of being in the station" where the levers of the interlocking plant were located, and "they would settle down and relax until the train is through and they would get the board". Shriver denied that he gave any high ball or made any signal for the movement of the train. After pointing towards the oncoming Great Western train as stated, he returned to do some paper work inside the station. He heard defendant's motorman blow a whistle after the pointing but only became aware that the electric train had moved against the Stop signal when he heard a noise of vibration caused by its approach and it was already close to the intersection. He cried out but saw that the motorman tried to speed up instead of stopping.

At the conclusion of all the evidence defendant moved for directed verdict in its favor, which was fully argued and briefed, and was denied.

The trial court instructed the jury that under the provisions of the contracts, R. R. Shriver in his capacity as operator of the interlocking plant was an employee of defendant and his negligence, if any, in connection with the operation of the interlocking plant would not constitute contributory negligence on the part of the plaintiff. To which defendant excepted.

It also instructed that the burden of proof was upon the plaintiff to establish by preponderance of the evidence (1) that the motorman operating the defendant's train was guilty of negligence in crossing the intersection under the existing circumstances; (2) that such negligence was a proximate cause of the collision, and (3) that it was free from contributory negligence. "If the plaintiff has established (1) (2) and (3) by the greater weight or preponderance of the evidence, then it is entitled to a verdict for the agreed amount of damages unless the defendant establishes its affirmative defense". To which no exception was taken.

The court then stated: "Its (the defendant's) affirmative defense is that under the provisions of the contracts referred to the plaintiff cannot recover herein". To which no exception was taken. The further instruction was that "in order to establish (1) that R. R. Shriver was guilty of negligence either in intentionally signalling to the motorman to proceed or by making a motion that might reasonably be interpreted as a signal to proceed, and (2) that such signal or motion was made in connection with the operation of the interlocking plant, and (3) that such negligence was a cause of the collision. If the defendant has established (1) (2) and (3) by the greater weight or preponderance of the evidence, then the plaintiff cannot recover" * * *.

The defendant took timely exception to the part of the instruction by which the jury was told that the burden was on defendant to establish "(2) that such signal or motion was made in connection with the operation of the interlocking plant."

It also excepted to the refusal of the court to give a requested instruction to the effect that if the jury found that the proximate cause of the collision was the concurrent negligence of the defendant's motorman Diamond and said R. R. Shriver, plaintiff could not recover.

After the jury had retired for deliberation it returned into court and counsel for both parties being present, propounded two questions, of which the first was: "Was Shriver considered operating the interlocking system his full time of duty, or only when in the tower with the machine?"

To which the court answered:

"You are instructed that under the contract between the parties Mr. Shriver has several duties. He looked after the sub-station, and so far as the freight and passenger business was concerned, he was the joint agent, and so far as operating the interlocking system, you are instructed that he was the employee of the Fort Dodge line and not the employee of the Great Western. Then your question is, was he considered operating this only when he was in the tower.

"If he had made a signal or a motion, the question of whether he was then within the scope of his employ-

ment, or the performance of his duties, is one of the questions that you must figure out. I might state with regard to that, the only thing that the Court might say by way of explanation is that, in connection with the interlocking system, the performance of that, in order to be a part of that, it would have to be and should be so related and so connected that it would be reasonably regarded as being part of his duties, and in so doing that he was performing part of his duties as the interlocking system operator. As I said before, he had other duties to perform beside that. The question that you submit is the very question that you must determine—and that is a fact question rather than a legal question." The jury's other question was:

"A person performing an act in good faith, but which might be construed to be a contributing factor, would this act be considered contributing negligence? Would that make any difference in our decision?"
The court answered:

"You have one other question which I am not sure that I understand.

"I might state that while we have to—by the very nature of things—use a lot of legal terms, and we give you a short course of law in twenty to thirty minutes—I am not sure but perhaps you are a little confused on your terms.

"We have what they call contributory cause and proximate cause. I define contributory negligence as being negligence on the part of the party seeking to recover which contributes in any manner or degree directly to the injury. Contributory negligence in this case has to do only with the employees of the Great Western Railroad who were operating the train. I do not know what the contention is with regard to the section men—these are the only people who are affected by contributory negligence. You are instructed that the contributory negligence of Mr. Shriver is not chargeable to the plaintiff. The only place where

contributory negligence comes in is with regard to the men who were operating the Great Western train. Probably, that is not the matter that is troubling you. That is the only place where contributory negligence comes in.

"Again, there is negligence which is a proximate cause, and that is the one which the lawyers argued at length, that is, that in order that the negligence of Mr. Shriver, if any, was to be considered as a cause, it would have to be as a proximate cause. I, therefore, defined proximate cause as a direct and natural cause unbroken by any other cause, without which the collision would not have occurred. That is a different cause than contributory cause. The same rule would be applied in the case of Mr. Diamond, the motorman. His negligence would have to be a proximate cause—and the same way with Mr. Shriver; his negligence, if any—and I use the term in all cases, the negligence, if any, because I do not say that anybody was negligent, but I say, if any. Therefore, the negligence of either Mr. Shriver or Mr. Diamond, to fit into these instructions, the negligence would have to be a direct and natural cause unbroken by any other cause and without which the collision would not have occurred. We are not dealing with contributory cause. We are dealing with proximate cause and not contributory negligence—the contributory negligence is negligence on the part of the party seeking to recover, which contributed in any manner or degree directly to the injury. Does that answer your question?

"Foreman J. E. Starner: 'Yes, I think it does, Judge.'"

The defendant duly excepted to the answers of the court which in effect reiterated the instructions originally given.

Thereafter, the jury having returned its verdict in favor of the plaintiff and against the defendant, judgment was entered thereon. The defendant subsequently moved for

judgment notwithstanding the verdict or for a new trial, and the motion was denied.

On this appeal of the Fort Dodge road it has not assigned any ruling on the introduction or rejection of evidence at the trial as error. It does contend, as it did below, that it was entitled to a peremptory instruction in its favor on the ground that the evidence showed as a matter of law that R. R. Shriver was guilty of negligence attributable to plaintiff that was a proximate cause of the accident. In that connection, it is argued that he violated a rule which required employees not to assume but to know that signals given by them to an engineman have been seen and obeyed. The contention is rested on the fact that Mr. Shriver did not wait about on the platform after he had shown himself there and had done the pointing he says he did but he returned to his work inside the office.

But the testimony of both the motorman and of Mr. Shriver was that they were looking directly at each other when Mr. Shriver showed himself and pointed as he testified, or raised his left arm or his left hand as the motorman said. There was no requirement of any rule that he remain standing on the platform until the trains had passed. Under the rules, the signal of the interlocking plant was controlling as to train movements because the proof was that the interlocking plant was in good working order. The record shows that the trial court properly permitted whatever railroad rules were deemed relevant to be received and considered by the jury in relation to Shriver's alleged negligence and it properly instructed as to the claim that Shriver was negligent as follows:

"It is the claim of the defendant that R. R. Shriver was guilty of negligence in either one of two particulars. Those particulars are (1) that R. R. Shriver gave a signal which was intended by him to be a signal to the motorman in charge of the defendant's train to proceed; (2) that R. R. Shriver, while not intending to give a signal to proceed, did make a motion that might reasonably be interpreted by an ordinary, careful and prudent motorman as a signal to proceed.

"If you find that an ordinary, careful and prudent person under the existing circumstances would not have intentionally given a signal to proceed or would not have made a motion which might be subject to being reasonably interpreted by an ordinary, careful and prudent motorman as a signal to proceed, then R. R. Shriver would be guilty of negligence if he did one or the other."

To which no exception was taken.

The specific negligence which defendant pleaded against Shriver was that "he signalled and directed defendant's train to proceed over and across the intersection" and if Shriver did not make a motion that might be subject to being reasonably so interpreted the allegation that he was negligent was not sustained.

█ The instruction correctly and fully stated the law applicable to what was manifestly a jury question in the case—whether or not Shriver was guilty of the negligence charged against him. The contention that defendant was entitled to a peremptory instruction is not sustained.

Appellant's other contentions for reversal are all to the effect that because Shriver was employed as joint station agent for both railroads to act for both as expressed in the contract "in conducting the station business as ordinarily and customarily conducted at similar railroad depots on the lines of the Western Company," that therefore the negligence charged against him in signalling the motorman to proceed should have been held to be attributable to the plaintiff in this action regardless of whether or not he was "engaged in the operation of the interlocking plant" within the provisions of paragraph 13 of the contract.

But only an elementary question of the law of negligence is presented by the record. If, as charged in defendant's answer, Shriver signalled or directed defendant's train to proceed onto the intersection in the circumstances shown, it was negligence attributable to the company employing him in the work in which such negligence occurred. For nearly fifty years defendant's electric line crossed plaintiff's prior established east and west line on the condi-

tion created by court decree and continued by the contracts that the later comer (the defendant) should perform the work of operating the interlocking plant for directing its own trains across the intersection. Most all of the time the east and west line of the Great Western was kept open to its owner. It was defendant's job to signal its closure and to open the track to its own trains when they required passage. There was no evidence that conducting railroad station business as "ordinarily and customarily conducted at railroad depots" along the lines of the Great Western included that work. It was, on the contrary, made the defendant's job by the decree and the contracts, and when Shriver was performing it, either carefully or negligently, Shriver was defendant's exclusive agent. Unless he was engaged in the operation of the interlocking plant, as defendant alleged in its answer that he was, there could be no valid claim that the exculpatory provisions of paragraph 13 of the contract in evidence would have afforded a bar to plaintiff's action. Defendant was required to establish its affirmative allegation to the effect that Shriver was engaged in that work in order to bring itself within the provisions of the contract. Failing to do that, it had no defense and was liable for the proven negligence of the motorman who was its exclusive agent.

 Appellant has been diligent in research and citation of the many Iowa and other cases dealing with collisions of trains and other vehicles with each other and with persons and with property in its effort to support its contention that the court should have instructed the jury to the effect that the negligent signalling charged against Shriver was, if proven, attributable to the plaintiff as contributory negligence on its part. But we find none to sustain the contention. Of course railroads owe non-delegable duties to government, members of the public and to their employees and others. They must answer to them for the negligence of those to whom they delegate performance of the duties, even if the delegation is by such plain contract as exhibited here. The cited cases illustrate the difficulties which arise in determining whose

is the work that is being done by an employee of more than one employer under the infinite variety of circumstances which are presented and the different angles from which the inquiry must be directed on account of the differing situations of the parties involved. But in this case there is no such difficulty. As between themselves these two railroads had the right to and did fix Shriver's status when he was engaged in operating the interlocking plant. Under the contracts that was the work of the defendant. It hired Shriver to perform it, and directed his performance of it; and on most elementary principles Shriver was its agent in the performance of it. The pleadings of both parties recognized the validity and binding effect of the contracts as between the parties. The instructions given by the court and its refusal to give the requested instruction merely gave effect to and were in accord with the contracts which fixed the status of Shriver as the agent of defendant and not of the plaintiff in the work he was engaged in.

As we find no error in the judgment, it is

Affirmed.